[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
March 31, 2004
THOMAS K. KAHN
CLERK

_____

No. 03-10486

_____

D. C. Docket No. 01-00199-CV-FTM-29-DNF

DENNIS EDIC, as parent and next friend
of Dylan Edic, minor son,
MELISSA EDIC, as parent and next friend
of Dylan Edic, minor son,

Plaintiffs-Appellants,

versus

CENTURY PRODUCTS COMPANY, a foreign
corporation and a division of Graco
Children's Products, Inc., a foreign
corporation, both subsidiaries of
Newell-Rubbermaid, a foreign corporation,
NEWELL-RUBBERMAID, a foreign corporation,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(March 31, 2004)

Before EDMONDSON, Chief Judge, BIRCH and FARRIS[*], Circuit Judges.

BIRCH, Circuit Judge:

This case arises out of an automobile collision during which eighteen-month-old Dylan Edic was ejected from his child restraint system (CRS). Dylan's parents, Dennis and Melissa Edic, filed a product liability suit, under Florida law, against the manufacturers of the CRS claiming that Dylan's ejectment was due to a defect in the CRS. They asserted that this defect had caused secondary injuries to Dylan beyond that which he would have endured from the primary collision alone. At the end of trial, the district court granted judgment as a matter of law to defendants, Century Products Company and Newell Rubbermaid Corporation (collectively, Century),[1] for two reasons. First, the district court found that the Edics had not provided sufficient evidence that the ejectment enhanced Dylan's injuries. Second, the district court held that the Edics had not provided sufficient evidence to permit Florida's <u>Cassisi</u> inference of a manufacturing defect. <u>Cassisi v. Maytag Co.</u>, 396 So.2d 1140, 1148 (Fla. Dist. Ct. App. 1981).

The Edics appeal the district court's grant of judgment as a matter of law as well as two of the district court's evidentiary rulings. We find no error in the

---

[*]Honorable Jerome Farris, United States Circuit Judge for the Ninth Circuit, sitting by designation.

[1]Century Products Company is a division of Graco Children's Products, Inc., and both are subsidiaries of Newell Rubbermaid, Inc. All three entities are named defendants in this suit.

district court's evidentiary rulings. However, we do find that the Edics provided sufficient evidence for a reasonable jury to infer that the CRS was defective and for a reasonable jury to conclude that these defects enhanced Dylan's injuries. Accordingly, we AFFIRM in part and REVERSE in part.

## I. BACKGROUND

Because this case reviews a grant of judgment as a matter of law for Century, we look at all the facts in the light most favorable to the Edics.

Dylan's father, Dennis Edic, was driving his Volvo station wagon when a Pontiac driven by a non-party, Palma Trotta, collided into the right side of the Volvo at 40 miles per hour. The impact of the collision crushed in the passenger side of the Volvo more than two feet and caused it to spin clockwise approximately 270° before coming to a stop. Dennis testified that, before he began driving on the day of the collision, he had placed Dylan into a child restraint system ("CRS") manufactured by Century Products Company. After the collision, Dylan was no longer in the CRS, but lying in the back of the car with a number of injuries, including a head wound.

From these facts, the Edics deduced that Dylan somehow had been ejected from the CRS and concluded that the cause of the ejection was a manufacturing defect in the CRS. The Edics then filed this action in Florida state court asserting

3

that Century should be held strictly liable for the alleged manufacturing defect in

the CRS.[2]  The Edics filed suit both: (1) individually, seeking damages for their loss

---

[2]We understand Edics' brief to argue the following theories of defective design of the CRS: (1) it was designed with a three-point harness system rather than a five-point harness system; (2) the manufacturer failed to place a clear indication of the date of manufacture on the CRS packaging; and (3) the manufacturer failed to warn consumers that the CRS was not subjected to side-impact crash testing. To the extent that the Edics have appealed these claims, we hold that judgment as a matter of law was properly awarded to Century for the reasons discussed as follows.

With regard to the Edics' claim that the CRS was defectively designed with a three-point harness system, the Edics have failed to put forth any evidence that this design was defective. A product is defective in design, under Florida law, "when the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reaonable alternative design and its omission renders the product not reasonably safe." Scheman-Gonzalez v. Saber Mfg. Co., 816 So. 2d 1133, 1139 (Fla. Dist. Ct. App. 2002) (citation omitted).  Plaintiffs have failed, however, to point to any evidence that the three-point harness design is "not reasonably safe," nor have we been able to find such evidence in our search of the record.  Plaintiffs' failure to offer any evidence showing that this design feature constitutes a defect is fatal to their claim regardless of whether the claim is based on negligence or strict liability.

The Edics' claim that the CRS was defective because there was no clear indication of the date of manufacture must also fail.  There is no evidence that the age of the CRS caused, or was related to, Dylan's ejectment. All that the Edics proffered was Dennis's testimony that he would not have used the CRS if he had known it was over six years old because he once read in a manual that one should not use a CRS that is over six years old.  This evidence does not indicate in any way that Dylan's injuries were related to the age of the CRS.  Accordingly, the failure to warn that the CRS was over six years old cannot be the basis for imposing liability on Century for Dylan's injuries.

Finally, the Edics argue that the CRS was defectively designed because Century did not warn consumers that the CRS was not subjected to side-impact collision tests.  This claim also fails because the Edics did not provide any evidence to show how such a warning could have avoided or ameliorated Dylan's injuries. American Motors Corp. v. Ellis, 403 So.2d 459 (Fla. Dist. Ct. App. 1981) (holding that there was no failure to warn where there was no evidence adduced at trial "to show how any warning from [the defendant] . . . could have prevented or ameliorated the injuries" suffered by plaintiff).  Dennis did not testify as to how such a warning would have affected his decisions regarding the use of this CRS.  Moreover, because Century's undisputed evidence showed that no CRS manufacturers were conducting such tests on child seats, we cannot infer that such a warning would have altered the Edics' decision to use this particular CRS.  R21 at 160-61.

4

of filial consortium; and (2) as next friends for their son, seeking damages for Dylan's head injuries.[3]

A. Plaintiffs' Evidence at Trial

At trial, the Edics relied on the Cassisi inference to prove a defect in the CRS. Under Florida law, the Cassisi inference allows a jury to infer that a product is defective when it (a) malfunctions (b) during normal use. Cassisi, 396 So.2d at 1148. On appeal, the Edics argue that they proved the malfunction requirement of Cassisi by showing that a CRS is intended to restrain children during collisions and that this CRS failed to restrain Dylan in this collision. With regard to the normal use requirement, the Edics argue that it was foreseeable to Century that the CRS would be involved in a side-impact automobile collision at 40 miles per hour and that case law supports the idea that "normal use" includes use that is reasonably foreseeable.

To prove a malfunction, the Edics proffered the discovery deposition of David Galambos, the corporate representative of defendant Graco. In his deposition, Galambos conceded that the CRS is intended to provide restraint to a child: "[I]t's very much like seat belts. It's a device used for children that help[s] reduce injuries in a case of an accident." R19 at 132. Moreover, Century's experts

---

[3]The Edics do not argue that any other injuries Dylan suffered were the result of his ejection from the CRS.

5

in biomechanics and accident reconstruction indicated that the CRS was not functioning as it should have during this collision. Specifically, both experts testified that this type of CRS, if the straps were properly adjusted, should have restrained a child of Dylan's size in this type of collision. R21 at 77, 183. The Edics also provided the testimony of several eyewitnesses to the collision supporting the Edics' contention that the "CRS" had not restrained Dylan during the collision. Sheila Cora, Donald Morrison, and Leslie McAlpine all testified that they saw Dylan in the back of the car rather than in the CRS immediately after the collision.[4]

The Edics also put forth evidence tending to show that Dylan's head injury (the only injury for which they seek damages) could have been caused by his ejection from the CRS. Most significantly, Patricia Merritt, another eyewitness to the collision, testified that she had an unobstructed view of the inside of the Volvo from her minivan, which was approximately two car lengths behind the Edics' Volvo. From this vantage point, she saw "a child fly up into the air" at the moment of impact and "hit its head into the top of the ceiling of the car." R20 at 236.

---

[4]Century called one eyewitness, Gilbert Dillen, who testified that he found Dylan in the CRS after the collision and moved him to the back seat. However, on cross examination, when asked to look at photos of the Volvo taken an hour after the collision, Dillen admitted that he could not see how it was physically possible for him to have moved Dylan as he had claimed.

Merritt also testified that she saw the child land on the "back portion seat of the car." Id.

The Edics also presented the videotaped deposition of Dr. Gerald Tuite, the neurosurgeon who treated Dylan's injuries, whose testimony lent some support to their argument that the ejection caused a secondary head injury. Tuite testified that his examination revealed "an open depressed skull fracture in the right parietal area." R12, Ex. 1 at 11. Although Dr. Tuite could not determine the exact source of Dylan's injury, he did state that the cause was "some sort of blow" to the right side of Dylan's head, which was consistent with Merritt's testimony that Dylan hit the right side of his head against the ceiling of the Volvo after being ejected. Id. at 57.

In addition, the Edics presented blood evidence indicating that Dylan's head injury did not occur while he was in the car seat. Specifically, witness testimony established that Dylan's injury was of a type prone to profuse bleeding and that Dylan was, in fact, profusely bleeding, yet no traces of blood were found on the CRS. R17 at 10, 27, 48, 61. In contrast, Dennis's mother, Belinda Edic, who inspected the Volvo a few weeks after the collision testified that she saw a stain in the back of the car, not on the CRS, which, in her opinion, looked like a blood stain. Id. at 65-66.

The Edics also rebutted Century's allegations that Dennis had misused the CRS with testimony including that of (1) a Florida Highway Patrol trooper who had investigated the accident scene and who testified that the CRS was properly placed and mounted in the rear seat; (2) Rich Holsinger, who had given the Edics the CRS for Dylan's first birthday and who testified that the CRS was "brand-new in a sealed box from the store," R19 at 68; (3) Dennis's testimony that the CRS had never been damaged or modified during the time that the Edics had owned it and that he had been taught, as part of a Lamaze class, how to place a child in a CRS to ensure that the harness straps fit tightly.

B. Defendants Evidence at Trial

After the Edics rested their case, Century called two expert witnesses. The first witness, Kevin Breen, was an accident reconstructionist who cast some doubt on Merritt's ability to see what happened during the collision. He offered his expert opinion that "[l]ess than a tenth of a second" would have transpired "from the time the Pontiac first [struck] the Volvo until the point of maximum crush." R21 at 57. Similarly, Century's expert in biomechanics, Dr. James H. McElhaney, testified that car crashes happen too quickly for witnesses to be able to see what is happening to the occupants. McElhaney also testified that, in his opinion, Dylan's injuries were caused at the moment the Pontiac collided into the Volvo––while Dylan was still in

8

the CRS—because the impact on the Volvo's passenger side would have driven the passenger door into Dylan's space.

However, during cross examination, both Breen and McElhaney also conceded that they would have expected Dylan to remain in the CRS, if it were properly positioned, in a collision of this severity. In fact, McElhaney, specifically opined that the CRS "would have restrained Dylan in this collision if the shoulder straps [were] properly adjusted." Id. at 183.

C. District Court's Judgment as a Matter of Law

Following the presentation of the Edics' case in chief, Century moved for judgment as a matter of law. The district court reserved its ruling on this motion until after Century presented its case. When Century renewed the motion at the close of all the proof, the district court granted it on two grounds.

First, the district court found that the Edics had produced no evidence that Dylan's head injury was attributable to the CRS's performance, rather than to the primary collision. Specifically, the district court found that there was no evidence of the order in which the damages occurred, leaving the jury to speculate that all injuries came after ejection and none came before. The district judge did not consider Merritt's testimony as proof of the order of events. The district court opined that the physical events of the accident happened too quickly for Merritt to

9

have seen Dylan fly out of the car seat and come to rest on the back seat before the car began to spin.

Second, the district court found that the Edics had not offered sufficient evidence to warrant the Cassisi inference of a product defect. Specifically, the district judge stated that normal use of a car seat did not include a collision of this severity, where one car slammed into the other without even applying the brakes.

The Edics filed a motion for a new trial pursuant to Federal Rule of Civil Procedure 59. The district court denied the Edics' motion, and they timely appealed.

## II. DISCUSSION

The Edics contend that the district court erred in granting judgment as a matter of law because: (1) the district court improperly weighed conflicting evidence and improperly made credibility determinations to reach the conclusion that there was no evidence of enhanced injuries and no evidence that the ejection from the CRS caused Dylan's injuries; and (2) the district court erred in ruling as a matter of law that the Cassisi inference of product defect did not apply in this case.

The Edics also raise two evidentiary issues in passing: (1) whether the district court erred when it denied their motions *in limine* to exclude Century's expert witnesses Breen and McElhaney, or when the district court overruled the Edics'

10

objections to portions of the expert testimony; and (2) whether the district court erred when it found that Florida Statute § 316.613(3), which provides that the failure to use a child passenger restraint shall not be admissible as evidence in any negligence action, did not prohibit Century from arguing that the Edics' misuse of the CRS was the cause of Dylan's injuries. Fla. Stat. Ann. §316.613(3) (2001). We discuss each of these arguments in turn, accepting the first two and rejecting the last two.

A. Judgment as a Matter of Law

1. Standard of Review

> We review a district court's decision to enter a judgment as a matter of law de novo. . . . [I]f there is substantial evidence opposed to the motion[], that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury . . . . [I]t is the function of the jury as the traditional finder of facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses.

Lipphardt v. Durango Steakhouse of Brandon, Inc., 267 F.3d 1183, 1186 (11th Cir. 2001) (citations and internal quotation marks omitted).

2. Evidence of Enhanced Injuries Caused by CRS Malfunction

11

The Edics first assert that the district court improperly weighed evidence and made credibility judgements in order to grant judgment as a matter of law to Century.

The district court's stated reason for granting Century's motion for judgment as a matter of law was that the Edics failed to prove enhanced injuries to Dylan caused by a CRS malfunction. The Edics argue that the district court, in reaching this conclusion, failed to look at several pieces of evidence in the light most favorable to them, including: (1) the testimony of Merritt that she saw Dylan hit the right side of his head on the roof of the car after being ejected from the car seat, (2) Dr. Truite's testimony that Dylan suffered a blow to the same area of his head that Merritt saw hit the car roof, and (3) the eyewitness testimony that Dylan was found outside the CRS immediately after the collision, and (4) the testimony that there was no blood found on the CRS even though Dylan's injury was of a type prone to profuse bleeding. We agree.

The transcript of the ruling on the motion for judgment as a matter of law indicates that the district court was weighing the evidence and making credibility judgments. Although the district judge stated that she did not need to "get into [Merritt's] credibililty," the greater part of her discussion did precisely that. R24 at 4, 5. Specifically, the district judge noted that Merritt's recollection of the events

"seem[ed im]possible " because "the physical forces at work would not allow either car to remain motionless for a period of time for a person to be ejected up and then back down and straddle the seat before turning." R24 at 3-4. Moreover, throughout the proceedings on the motion, the district judge weighed Merritt's recollection of events against the experts' testimony regarding the timing of events and concluded that Merritt could not possibly have made the observations she made because "the physical events [do] not allow for the increments of the damage that would occur to the child." R24 at 3.

Although we agree that the district court improperly weighed the evidence in reaching its decision, our analysis does not end there. Before we hold that judgment as a matter of law was improper, we must determine whether there was, in fact, sufficient evidence of enhanced injury and causation for these issues to go to the jury. We hold that there was. A reasonable jury after hearing (1) Merritt's testimony; (2) Dr. Truite's testimony; (3) the testimony regarding the location Dylan's body after the collision; and (4) the evidence that no blood was found on the CRS, could conclude that Dylan was ejected from the CRS and that this ejectment, not the primary collision, caused Dylan's head injury.

Century argues that this evidence of enhanced injury and causation was insufficient because the Edics did not have expert testimony proving enhanced

13

injuries from a CRS defect. "No testimony of an expert [is] needed when the jury, in its ordinary experience, [can] draw its own conclusion from the facts ." Adamo v. Manatee Condo., Inc., 548 So.2d 287, 289 (Fla. Dist. Ct. App. 1989) (per curiam). Given the four pieces of evidence described in the preceeding paragraph, the jury did not need an expert to make the causal connection between Dylan's ejectment and his head injury. See, e.g., Curtis v. General Motors Corp., 649 F.2d 808, 813 (10th Cir. 1981) (per curiam) (holding that expert testimony to establish enhanced injuries was necessary to avoid jury speculation because there was no other testimony to establish a causal connection to the injury).[5]

3. Cassisi Inference

---

[5]Century also argues that, because Florida law places the burden on the plaintiff to prove the extent of the enhanced injuries attributable to the alleged defect, D'Amario v. Ford Motor Co., 806 So.2d 424 (Fla. 2001) (per curiam), Florida law also requires expert testimony to prove enhanced injuries. Century bases this conclusion on their reading of cases from other jurisdictions that place the same burden on the plaintiff. Century argues that these other jurisdictions also require expert testimony to prove enhanced injuries. This argument fails for two reasons:

First, in D'Amario, the Florida Supreme Court was only addressing the issue of whether comparative fault principles generally apply in crashworthiness and enhanced injury cases. Nowhere in the opinion does the court discuss whether enhanced injuries must be proven through expert testimony. The issues are completely unrelated, therefore, even if other jurisdictions that apportion the burden of proof in the same way as the Florida courts also choose to require expert testimoeny, it is nothing more than a coincidence. Placing the burden of proving enhanced injuries on the plaintiff does not logically require the conclusion that the plaintiffs must make their proof through expert testimony.

Second, a review of the cases Century cites for the proposition that expert testimony is required in other jurisdictions indicates that the Century is misreading these cases. For example, Century cites Mazda Motor Corp. v. Lindahl, 706 A.2d 526 (Del. 1998), which does not state that expert testimony is required. Instead, the Delaware Supreme Court states that expert testimony might be necessary in enhanced injury cases when the question of proximate cause "require[s] understanding and analysis of issues beyond the ken of the typical jury." Id. at 533.

14

The district court's second reason for granting judgment as a matter of law to Century was that the Edics' evidence was insufficient to create a <u>Cassisi</u> inference of a manufacturing defect in the CRS. Without this inference, the Edics could not prove a manufacturing defect and thus, the district court concluded, judgment as a matter of law was proper. The Edics contend that the district court erred in ruling that the <u>Cassisi</u> inference did not apply as a matter of law.

Florida's <u>Cassisi</u> inference provides that "when a product malfunctions during normal operation, a legal inference . . . of product defectiveness[] arises, and the injured plaintiff thereby establishes a prima facie case for jury consideration." <u>Cassisi</u>, 396 So.2d at 1148. The district court determined that the <u>Cassisi</u> inference was not available because the normal use requirment was not met. Specifically, the district judge stated that "[o]ne would not say that it was normal use of a car seat to be subjected to this kind of accident when the car that hit the Volvo car . . . did not apply the brakes and just slammed right into it." R23 at 12. For two reasons, we agree with the Edics that it was error for the district court to determine that this collision was not normal use as a matter of law.

First, we conclude that the question of normal use, in the context of this collision, was a question of fact for the jury and, as such, the district court erred when it took this issue away from the jury. As Century's corporate representative

15

conceded, the normal use and purpose of a CRS is to restrain a child during an automobile collision; therefore, at least some collisions must consitute normal use for the CRS.[6]  Moreover, the Florida Supreme Court has noted that automobiles are frequently involved in collisions and has held that the probability of these collisions "must be taken into account by designers and manufacturers." Ford Motor Co. v. Evancho, 327 So.2d 201, 203 (Fla. 1976).  Although that case involved the manufacturer of a car rather than a CRS, the same principle holds true for the manufacturers of a CRS because they also know that their product will be involved in mishaps—in fact, their product serves no purpose (other than to prevent the child from moving about) until it is involved in a collision.  Conversely, some collisions will be so horrific and unpredictable that no reasonable person would expect the CRS to function properly.

A side-impact collision at 40 miles per hour is somewhere in between:  it is more serious than the simulated frontal collision safety tests at 30 miles per hour, but not necessarily serious enough to be unforeseeable to the defendant manufacturers of the CRS.  R21 at 160.  For this reason, this collision falls within a

---

[6]Century argues that Humphreys v. General Motors Corp., 839 F. Supp. 822, 829 (N.D. Fla. 1993), aff'd 47 F.3d 430 (11th Cir. 1995), precludes us from permitting the Cassisi inference in this case because, in that case, the Florida trial court held that the collision involved was not normal use.  The Humphreys opinion, however, is not binding authority and our order affirming Humphreys did not discuss whether automobile collisions are normal use.

16

range where a reasonable jury could find that it is normal use. As such, we determine that the question of normal use is a question of fact for the jury.

In support of this conclusion, we note that the normal use requirement from Cassisi is based on the consumer expectations test from the Restatement of Torts (Second), which asks whether "the ordinary consumer's expectations [are] frustrated by the product's failure to perform under the circumstances in which is failed." 396 So.2d at 1144-45. This, in turn, is generally a question of fact for the jury.[7] See, e.g., Zabner v. Howard Johnson's, Inc., 201 So.2d 824, 828 (Fla. Dist. Ct. App. 1967); Lewis Bass, Prods. Liability: Design and Manufacturing Defects § 4.12 (2d ed. 2003).

Second, we note that there is ample evidence that Dylan was somehow ejected from the CRS, and that both defense experts testified that the CRS should have restrained Dylan in this collision. We conclude that the evidence that this CRS should have restrained Dylan but failed to do so is sufficient to permit the Cassisi inference of defect because it implies that the CRS malfunctioned during a collision that was within the range of its normal use.

_____

[7]We also note, however, that some cases will involve products and situations where the normal use question can be determined as a matter of law. See e.g., Cassisi, 396 So.2d at 1142-43 (the product was a clothes dryer and plaintiffs were using it to dry clothes).

17

In fact, the evidence just described is substantially similar to that in another case where the Florida District Court of Appeals held that the evidence was sufficient to permit a <u>Cassisi</u> inference of defect. In <u>Jones v. Heil Co.</u>, 566 So.2d 565 (Fla. Dist. Ct. App. 1990), the plaintiff sued for damages from injuries he sustained when a refuse collection unit expelled some boards, one of which struck the plaintiff in the face. The Florida District Court of Appeals held that there was enough evidence to permit the <u>Cassisi</u> inference of defect because there was (1) expert testimony that, based on the design of the unit, it should not have expelled the boards and (2) plaintiffs' testimony that the boards and other objects had been ejected from the truck. <u>Id.</u> at 567. Similarly, here we have (1) Breen and McElhaney's testimony that the CRS should have restrained Dylan during this particular collision[8] and (2) evidence that Dylan was, in fact, not restrained.[9] The evidence here, as in <u>Jones</u>, "supports a reasonable inference that the [product] malfunctioned during normal, expected operation." <u>Id.</u> Because the evidence

---

[8]The fact that Breen and McElhaney testified that they believed owner misuse, not a defect, caused Dylan to be ejected does not change our analysis. In <u>Jones</u>, like here, the expert witness was a defense witness who did not believe a defect caused the injury at issue. It is sufficient that the experts here testified that the product, manufactured and used properly, should not have ejected Dylan.

[9]Merritt's account of seeing Dylan fly out of the car seat in addition to the fact that Dylan's body was found out of the car seat immediately after the collision show that he was ejected at some point.

18

available in this case is similar to that in Jones,[10] where the Cassisi inference was permitted, we conclude it is appropriate to permit the inference here as well.

B. Evidentiary Issues

1. Expert Testimony

The Edics make two arguments regarding the admissibility of testimony from Century's experts Breen and McElhaney.  First, the Edics argue that the district court erred by failing to outline its entire Daubert analysis in its order denying their motion *in limine* to exclude the testimony of those expert witnesses.  See Daubert v. Merrill Dow Pharm., 509 U.S. 579, 113 S. Ct. 2786 (1993).  The Edics cite no authority, however, for their argument that the district court must give a comprehensive review of its Daubert analysis in ruling on a motion *in limine*. Moreover, in denying the Edics' motion, the district court expressly adopted the reasoning of the Century's response, which did in fact contain a comprehensive Daubert analysis.

---

[10]Moreover, we have also addressed this issue in an unpublished opinion involving a collision during which another car safety device, a side airbag, failed to deploy. Kaplan v. Daimlerchrysler, No. 02-13223 (11th Cir. Aug. 1, 2003).  In that case, we permitted a Cassisi inference of defect because the plaintiffs offered expert testimony from an accident reconstructionist who concluded that, although the collision in that case was more severe than the crashes the type of car involved was subjected to during safety tests, the airbag should have deployed.  Here, as in Kaplan, we have expert testimony that the CRS should have functioned during the collsion that occurred even though it was more severe than those involved in the CRS safety tests.

Second, the Edics argue that the district court improperly permitted defense experts to alter the findings submitted in their Rule 26 Discovery Reports in order to take account of information that was not available to them at the time they wrote their reports. We review "[t]he district court's decision overruling defense counsel's objection to the admission of testimony . . . for an abuse of discretion resulting in substantial prejudice to the defendant's rights." United States v. Howard, 953 F.2d 610, 612 (11th Cir. 1992) (per curiam). For two reasons, we conclude that there was no such abuse of discretion. First, the Edics fail to specify which statements they find objectionable, making it impossible for us to determine whether there actually were contradictions. Second, the Edics fail to explain how these rulings prejudiced them.[11]

2. Evidence of Misuse

The Edics assert that the district court erred by finding that Florida Statute § 316.613(3) did not bar Century from asserting that the Edics' misuse of the CRS, and not a CRS defect, was the cause of Dylan's injuries. We review "de novo a

---

[11]In fact, we find it unlikely that these rulings would have prejudiced the Edics' case considering that the Edics had ample opportunity to bring any contradictions to the jury's attention through cross-examination.

20

district's determination of state law." Salve Regina College v. Russell, 499 U.S. 225, 231, 111 S. Ct. 1217, 1221 (1991).

Florida law provides that "[t]he failure to provide and use a child passenger restraint shall not be considered comparative negligence, nor shall such failure be admissible as evidence in the trial of any civil action with regard to negligence." Fla. Stat. Ann. §316.613. Because the evidence of Dennis's misuse is not being offered to prove his negligence—the situation to which § 316.613 expressly applies—but to disprove a manufacturing defect, the district court did not err in ruling that the statute did not bar this evidence.[12]

Moreover, refusing to admit evidence of misuse for the purpose of disproving a defect would lead to an illogical and unintended result. It would permit a parent who obviously misused a product to hold a manufacturer liable because the manufacturer could not use the evidence of misuse to disprove a product defect. This, in turn, would contravene Florida's public policy of ensuring that "no

---

[12]The Edics argue, however, that the Florida courts should interpret the phrase "failure to provide" to include misuse as well. The only support they have for this proposition is non-binding authority from the Kansas Supreme Court. Watkins v. Hartsock, 783 P.2d 1293, 1299 (Kan. 1989). Not only is Watkins non-binding, but in Watkins, the evidence of non-use was being offered to show comparative negligence and to mitigate damages, not to disprove a product defect. In fact, the Tenth Circuit, applying Kansas tort law after Watkins, made this same distinction and held that the statute would not bar evidence of misuse offered in a products liability case to defend allegations of a defect. Gardner v. Chrysler Corp., 89 F.3d 729, 736 (10th Cir. 1996).

21

defendant will be held responsible for damages it did not cause." D'Amario v. Ford Motor Co., 806 So.2d 424, 440 (Fla. 2002).

### III. CONCLUSION

In sum, we hold that the district court properly denied the Edic's motion to exclude Century's expert witnesses and properly ruled that Fla. Stat. § 316.613 did not bar Century from introducing evidence of Dennis's misuse of the CRS. However, we also hold that the district court erred when it found that the Edics had failed to introduce sufficient evidence of enhanced injuries and defect and, as a result, erred when it granted judgment as a matter of law to Century. Accordingly, we AFFIRM the district court's evidentiary rulings, but REVERSE the district court's grant of judgment as a matter of law, and REMAND this case to the district court for further proceedings consistent with this opinion.

EDMONDSON, Chief Judge, dissenting in part:

I would affirm the judgment of the district court. I do not understand

"normal use" to be a jury issue under Florida law.